IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

GREAT NORTHERN INSURANCE          *
COMPANY, as subrogee of JOHN      *
and NANCY GORDON, and             *
ASSURANCE COMPANY OF AMERICA,     *
as subrogee of G. BRAZER &        *
ASSOCIATES, LLC,                  *
                                  *
            Plaintiffs,           *
                                  *
      v.                          *          CV 408-194
                                  *
MARTIN RUIZ d/b/a HILTON **HEAD** *
PAINTING and THE FORD             *
PLANTATION, LLC,                  *
                                  *
            Defendants.           *

---

## ORDER

Before the Court are several motions filed by Plaintiffs and Defendants. On March 27, 2009, Plaintiffs filed a "Stipulation for Substitution of Party," consented to by all parties in this case, requesting that the Court "allow the substitution of the Ford Plantation Association in place of the Ford Plantation, LLC." (Doc. no. 33.) A little over a month later, on May 13, 2009, Defendant Martin Ruiz filed a Motion to Strike Plaintiffs' Expert Witness and a related motion for summary judgment. (Doc. nos. 38 & 39.) That same day, Defendant, the Ford

1

Plantation, LLC ("Ford LLC"), filed a separate motion for summary judgment. (Doc. no. 42.) Upon consideration of the record evidence, the briefs submitted by counsel, and the relevant law, Plaintiffs' Motion for Substitution of Party is **GRANTED**, Defendant Martin Ruiz's Motion to Strike Plaintiffs' Expert Witness and his related motion for summary judgment are **DENIED**, and the Ford Plantation Association's Motion for Summary Judgment[1] is **GRANTED**.

## I. BACKGROUND

### A. March 29, 2007—The Day of the Fire

This subrogation action arises out of a March 29, 2007 residential fire that occurred at the Ford Plantation—an upscale, gated community located in Richmond Hill, Georgia. (Compl. ¶¶ 9, 16.) Sometime on or around January of 2006, George Brazer & Associates ("Brazer") began construction on a home for John and Nancy Gordon, which was to be located within the Ford Plantation. (Brazer Dep. at 9.) Brazer hired Martin Ruiz d/b/a Hilton Head Painting to serve as

---

[1] While this Motion was originally filed by Ford LLC, for the reasons set forth below, Plaintiffs' Motion to Substitute Party is **GRANTED** and Ford LLC shall no longer be a party to this suit. It is undisputed here that Ford LLC and the Ford Plantation Association ("Association") are both operated by the same board of directors, represented by the same counsel, and both would be subjected to the same claims and would advance the same defenses. (Doc. no. 57 at 8.) Therefore, the Court shall treat the Motion as if it had been filed by the Association.

the painting subcontractor at the Gordons' residence. (Ruiz Dep. at 18-19.)

On March 29, 2007, prior to the fire, Martin Ruiz and four other workers stained wood within the Gordons' home. (Id. at 20.)  On that particular day, they stained wood located in the study, which was located at the west end of the house.  (Id.)  They also performed work in the study's attached bathroom, a hall leading to the living room, and in the living room.  (Brazer Dep. at 12.)  Throughout the staining process, the stain was applied with rags, which, at the end of the day, were usually placed in five gallon buckets that were then filled with water and placed in an exterior dumpster.  (Ruiz Dep. at 34-35.)

Martin Ruiz left the Gordons' home sometime between noon and two o'clock in the afternoon on the day of the fire.  (Id. at 20.)  At that time, four painters were still working in the house.  (Id. at 27.)  Between 3:30 p.m. and 4:00 p.m., when contractor Scott Brazer left the worksite, the painters were the only subcontractors left at the house (Brazer Dep. at 11); the painters did not leave until 4:30 p.m.  (Ruiz Dep. at 27).

The night of the fire, a surveillance camera positioned at a marina located directly behind the Gordons' home recorded a significant portion of the fire.  (Vasher

Dep. at 33; Tijerina Dep. at 29.) The camera's range of view consisted of the marina and a limited portion of the Gordons' home. (Vasher Dep. at 33.) According to Plaintiffs' cause and origin expert, visible flames first appear on the video at approximately 8:11 p.m.,[2] in between the living room and the gallery area, on the west side of the house. (Tijerina Dep. at 32-33.)

Jacob Grant, a security guard at the Ford Plantation, was the first to encounter the fire, which he came upon at approximately 8:50 p.m. during a routine patrol of the neighborhood. (Grant Dep. at 32; Mealor Dep. at 22.) When Mr. Grant arrived, he saw a fire burning within the interior of the house; the house's frame was still intact. (Grant Dep. at 34-35.) Mr. Grant subsequently requested by radio that the fire department be contacted. (Id.) Despite Mr. Grant's and the firefighters' efforts, the house was burned nearly completely to the ground. (Mealor Dep. at 9-10.)

### B. Plaintiffs' Post-Fire Investigation

Plaintiffs retained electrical engineer, John Nemeth, and investigator Antony Tijerina to determine the cause and

---

[2] There is a discrepancy between the time-stamp on the video and the actual time the events took place. For purposes of this Order, all times are estimates of the actual time events took place rather than the time noted on the video. (See Mealor Dep. at 22.)

origin of the fire. (Tijerina Dep. at 25; Nemeth Dep. at 13.) Mr. Tijerina visited the site of the fire three or four times. (Tijerina Dep. at 64.) Among other things, Mr. Tijerina conducted a number of interviews (Tijerina Dep. at 27-28, 34, 36), sifted through debris (id. at 38), analyzed burn patterns, identified charring and other evidence of severe burning (id. at 51), and reviewed the video evidence of the fire (id. at 31). Based upon Mr. Tijerina's investigation, combined with his personal experience in the field, he determined that, in his opinion, the fire originated on the main floor in the center of the home. (Id. at 30.)

Mr. Nemeth's investigation focused on determining the role, if any, the electrical system played in the fire. (Nemeth Dep. at 14.) Mr. Nemeth's investigation proceeded from the outside in; he looked at the electrical system, starting at the transformers that fed into the structure, surveyed the structure and electrical system to determine if anything was out of the ordinary, and then, finally, concentrated on the area of origin identified by Mr. Tijerina. (Id. at 27-29.) At the conclusion of his investigation, Mr. Nemeth found that, to a reasonable degree of scientific certainty, no electrical component

within the area of origin could have started the fire. (Id. at 34.)

Based upon Mr. Nemeth's conclusions, Mr. Tijerina's own investigation, and process of elimination,[3] Mr. Tijerina determined that the fire was caused by the spontaneous combustion of Zar-stained rags left behind by the painters. (Tijerina Dep. at 59-60.) Zar is an oil-based wood stain that was used by the painters while staining the Gordons' floors. (Ruiz Dep. at 30.) Zar-stained rags are prone to spontaneous combustion if not disposed of properly, according to the product's material safety data sheet. (Doc. no. 46, Ex. 5 at 2.) Mr. Tijerina's opinion was based upon evidence gathered during the course of his investigation, his experience, and the fact that he was able to eliminate all other possible causes of the fire. (Tijerina Dep. at 59-60.)

---

[3] Mr. Tijerina stated in his deposition, "After reviewing the fire and going through it step by step and examining and eliminating the electricity, eliminating the HV/AC system, eliminating anything else in the area of origin that would have caused the fire, [the spontaneous combustion of oil-stained rags] was the last reasonable hypothesis that fit the scenario." (Tijerina Dep. at 44.)
Mr. Tijerina explicitly described this process throughout his deposition. For example, gas lanterns on the exterior of the house were eliminated as a possible cause based upon how a gas-line fire develops and the video evidence which indicated the fire progressed significantly inside the home before any indication arose of the fire being outside (id. at 52-54); the heating and air system, along with all other electrical components within the vicinity of the origin were eliminated as a possible cause by electrical expert, John Nemeth, whose testimony has not been objected to by Defendants (Nemeth Dep. at 34); Mr. Tijerina also added that the heating and air conditioning system was located under the house, and the video showed no evidence of fire under the house until the fire ventilated (Tijerina Dep. at 55-56).

## C. Security at the Ford Plantation

In addition to bringing a claim against Defendant Martin Ruiz, Plaintiffs have also asserted negligence and gross negligence claims against Ford LLC, which they now wish to assert against the Ford Plantation Association ("Association"). (Compl. ¶ 42; Doc. no. 33.) Plaintiffs claim that the Association failed to "properly secure the premises, monitor the video surveillance and notify the emergency personnel in a timely manner." (Compl. ¶¶ 27-34, 40-45.) Plaintiffs have since admitted that Ford LLC and, indirectly, the Association are absolved of simple negligence, in light of the Ford Plantation's binding Declaration of Covenants, Conditions, and Restrictions. (See Doc. no. 57 at 9.) Plaintiffs still contend, however, that the Association should be liable for its gross negligence. (Id.)

The Ford Plantation's Declaration of Covenants, Conditions, and Restrictions states the following regarding security at the Ford Plantation:

> The Association may, but shall not be obligated to, maintain or support certain activities within the Properties designed to make the Properties safer than they otherwise might be. Neither the Association, the original Declarant, nor any successor Declarant shall in any way be considered insurers or guarantors of security within the Properties, nor shall any of them be held liable for any loss or damage by reason of failure to provide adequate security or

> ineffectiveness of security measures undertaken. No representation or warranty is made that any measures taken, including any mechanism or system for limiting access to the Properties, cannot be compromised or circumvented, nor that any such security measures undertaken will in all cases prevent loss or provide the protection for which the system is designed or intended. Each Owner acknowledges, understands and covenants to inform its tenants and all occupants of its Unit that the Association, its Board of Directors and committees, Declarant, and any successor Declarant are not insurers and that each Person using the Properties assumes all risk of personal injury and loss or damage to property, including Units and the contents of Units, resulting from acts of third parties.

(Doc. no. 42, Ex. 1 at 11.)

The Association provides limited security for the residents of the Ford Plantation. (Vasher Dep. at 13.) The security consists of a gate officer, vehicle patrol officers, and surveillance cameras. (Id. at 17-18.) The security officers serve several functions: they provide access control for the Ford Plantation and escorts upon request, they respond to burglar and fire alarms, and they report fires when they are detected. (Id. at 13-14.)

The gate officer, specifically, focuses on access control, which largely consists of monitoring the main gate, greeting residents, fielding phone calls, and regulating the inflow of visitors. (Id. at 17-18.) The gate officer is also responsible, however, for watching the three monitors which display images transmitted by ten

8

cameras situated throughout the Ford Plantation; these cameras are largely focused on entry points located throughout the property. (Id. at 19-23.) On the day of the fire, one of the surveillance cameras located at the marina was positioned in such a way that it transmitted a view of the water, dock, seawall, and a portion of the Gordons' house. (Id. at 33.)

While monitoring the images transmitted by the surveillance cameras is part of the gate officer's duties, there is no standard operating procedure governing this duty, and officers are not told how often they are supposed to watch the monitors. (Id. at 27.) Generally, gate officers check the monitors whenever they happen to have time, because their priority is to check cars and issue passes to cars coming into the gate. (Gaskin Dep. at 25-30.)


## II. SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor," <u>United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Counties</u>, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970) and <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial

10

burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings

or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

The Clerk has given the non-moving party notice of the summary judgment motions and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. nos. 40 & 43.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motions are ripe for consideration.

## III. DISCUSSION

### A. Defendant Martin Ruiz's Motion to Strike Plaintiffs' Expert Witness and His Related Motion for Summary Judgment

#### 1. Martin Ruiz's Motion to Strike Plaintiffs' Expert Witness

On May 13, 2009, Defendant Martin Ruiz filed a Motion to Strike Plaintiffs' Expert Witness, Antony Tijerina, who has been retained by Plaintiffs for the purpose of testifying as a fire cause and origin expert. (Doc. no. 38.) Defendant Ruiz argues that Mr. Tijerina's opinions

12

are not based upon facts or evidence in the record and are not based upon a reliable methodology. (Id. at 4-7.)

Rule 702 of the Federal Rules of Evidence reads as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The Eleventh Circuit has held, in light of Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), that Rule 702 mandates that district courts perform a critical "gatekeeping" function in determining the admissibility of scientific and technical expert evidence. United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004). "The objective of that requirement is to ensure the reliability and relevancy of expert testimony." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999). In Frazier, the Eleventh Circuit held that, when determining the admissibility of expert testimony under Rule 702, trial courts must engage in a three-part inquiry:

> Trial courts must consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Frazier, 387 F.3d at 1260 (citations omitted). "The burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999).

As stated above, Defendant Ruiz does not dispute Mr. Tijerina's qualifications, and neither does this Court. Mr. Tijerina has over twenty years of experience investigating the causes and origins of fires. This experience comes from Mr. Tijerina's work in a variety of different capacities: as a deputy fire marshal, an insurance investigator, and a consultant. (Tijerina Dep. at 6-15.) He is a certified fire and arson investigator and a member of the International Association of Arson Investigators, the National Fire Protection Association, the National Association of Fire Investigators, and a

member of the National Fire Protection Association Technical Committee. (Doc. no. 38, Ex. 1 at 43.)

Another requirement under Rule 702 "is that [expert testimony must] assist the trier of fact. By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." Frazier, 387 F.3d at 1262. Defendant Ruiz does not dispute that Mr. Tijerina's testimony meets this requirement.

The determination of the cause and origin of a fire is frequently considered "beyond the understanding of the average lay person" and expert testimony on this issue is regularly admitted at trial. See United States v. Santiago, 202 Fed. Appx. 399, 401 (11th Cir. 2006) (finding district court did not abuse its discretion when it admitted testimony of experts regarding cause and origin of fire); Lise St. Cyr v. Flying J Inc., No. 3:06-cv-13, 2008 WL 2608127, at *7 (M.D. Fla. 2008) ("The cause and origin of fires as well as other scientific and technical matters that will arise in this case are neither matters of common sense nor common knowledge."); Allstate Ins. Co. v. Hugh Cole Builder, Inc., 137 F. Supp. 2d 1283, 1292 (M.D. Ala. 2001) (permitting testimony of expert regarding cause and origin of fire).

Mr. Tijerina's testimony is based upon, among other things, the interpretation of fire debris, charring, and burn patterns. In addition, underlying Mr. Tijerina's analysis of the video of the fire is an understanding regarding the typical path of a fire; it is this same understanding that also allows him to rule out all but one possible cause of the fire. Accordingly, Mr. Tijerina's testimony, if admitted, through the application of his technical expertise, would surely assist the trier of fact in making a decision regarding the origin and cause of the fire.

Defendant Ruiz argues, however, that pursuant to Rule 702, Mr. Tijerina's opinions are not based upon sufficient facts or evidence in the record. (Doc. no. 38 at 4.) He also argues that Mr. Tijerina's testimony regarding the cause and origin of the fire is not based upon a reliable methodology. (Id. at 7-10.) The Court will address each of these arguments in turn.

### a. Sufficient Facts or Data

Defendant Ruiz contends that "there is no evidence in this case that stain soaked rags were left at the residence by the painters on the day of the fire." (Id. at 4.) In support of this contention, Defendant Ruiz cites the fact that "there has been no testimony in this case that stain

soaked rags were left in the home on the day of the fire."
(Id. at 5.) Defendant Ruiz's argument fails for several
reasons set forth below. Accordingly, this Court finds
that Mr. Tijerina's testimony is based upon sufficient
facts, such that his testimony should not be excluded on
this basis.

Implicit in Defendant's argument is the contention
that an expert can only rely on direct evidence. Defendant
Ruiz is mistaken. "Although [an expert] lacks direct
evidence of the cause of the fire, [the expert] may rely
upon circumstantial evidence to support his theory."
Allstate, 137 F. Supp. 2d at 1289; see also Rudd v. Gen.
Motors Corp., 127 F. Supp. 2d 1330, 1343 (M.D. Ala. 2001)
("Again, contrary to GM's contention, the fact that much of
[the expert's] data constitutes circumstantial evidence
does not of itself detract from their substantiality. . . .
Inference chains built upon . . . circumstantial evidence
are a well-established feature of admissible expert
testimony.")

Mr. Tijerina bases his opinion—that oil-stained rags
were present in the house on the day of the fire—on several
pieces of circumstantial evidence: the painters were the
last ones to leave the building, remnants of clean rags
were found in the home after the fire, and several

products, including wood stain, were left in the home by the painters on the day of the fire. (Tijerina Dep. at 37-43.) Mr. Tijerina also relies on the testimony of Kristopher Kerns (Id. at 37), another subcontractor for the Gordons, who noted during his deposition that the painters had a habit of leaving their oil-stained rags in the home overnight (Kerns Dep. at 17-18). Moreover, obtaining direct evidence that soiled rags were left behind by the painters has been understandably difficult given that Defendant Ruiz has been unable to provide vital information regarding the whereabouts of his former employees (Ruiz Dep. at 21) and any physical evidence of soiled rags was likely destroyed in the fire (Tijerina Dep. at 44).

Furthermore, like in Allstate, Mr. Tijerina "went through a process of eliminating alternative explanations, [and] concluded that no other explanation existed to explain the cause of the fire." Allstate, 137 F. Supp. 2d at 1290; (Tijerina Dep. at 60). Defendant Ruiz attempts to undercut this final basis for Mr. Tijerina's opinion by noting that Mr. Tijerina, for purposes of eliminating potential electrical causes of the fire, relied upon the expertise of electrical expert John Nemeth who stated, in his report, "[D]ue to the extent of the damage, the electrical system could not be completely eliminated as a

possible cause." (Doc. no. 68 at 5.) Mr. Nemeth, however, clarified this statement during his deposition. (Nemeth Dep. at 40.) For efficiency reasons, Mr. Nemeth's investigation focused on the area where the fire allegedly began and, understandably, Mr. Nemeth could not speak in detail regarding all the other electrical components in the home. (Id.) Mr. Tijerina, as a fire cause and origin expert, identified the origin and then Mr. Nemeth, an electrical expert, determined that no electrical component in the area of origin could have been the cause of the fire. (Id. at 34, 39-40.) Based on the fact that Mr. Nemeth largely relied on Mr. Tijerina's determination as to the origin of the fire, it is clear to the Court why he could not eliminate, as a cause of the fire, all electrical components in the entire home. (Nemeth Dep. at 40.) It would have made little sense for Mr. Nemeth to spend costly time investigating portions of the house that were nowhere near the alleged area of origin.

Finally, Defendant Ruiz argues in his motion, "Nemeth's expert report clearly leaves open the possibility that a defect in the electrical system outside the area of origin could have been a possible cause of this fire." (Doc. no. 68 at 5.) To the extent that Defendant Ruiz argues that Mr. Tijerina must have determined the cause of

the fire with one-hundred percent certainty in order for his testimony to be admissible, Defendant Ruiz is mistaken. The Eleventh Circuit has held:

> It is true that relevant testimony from a qualified expert is admissible only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation. However, *absolute certainty is not required*. Expert testimony is admissible which connects conditions existing later to those existing earlier provided the connection is concluded logically. Whether this logical basis has been established is within the discretion of the trial judge and the weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility.

Jones v. Otis Elevator Co., 861 F.2d 655, 662-63 (11th Cir. 1988) (emphasis added).

### b. Reliable Principles and Methods

Defendant Ruiz also argues that Mr. Tijerina's testimony is not based upon a reliable methodology. Defendant Ruiz asserts that Mr. Tijerina is not fully aware of the factors contributing to spontaneous combustion, he is not aware of the actual conditions within the home the night of the fire, and has not performed any tests of his hypothesis. (Doc. no. 38 at 7-10.) For these reasons, among others, Defendant Ruiz argues that Mr. Tijerina's testimony should be excluded. The Court disagrees.

> To evaluate the reliability of scientific expert opinion, [courts should] consider, to the extent practicable: (1) whether the expert's theory can be and has been tested; (2) whether the theory

20

has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion.

Frazier, 387 F.3d at 1262 (citations omitted).

In Santiago, 202 Fed. Appx. at 400, a man was accused of burning down a bagging warehouse. The government's case included expert testimony of a fire investigator who specialized in determining the cause and origin of fires. Id. The Santiago court stated:

[The expert] systematically examined the scene [of the fire] and used the scientific method to identify the fire's origin and to rule out any accidents or acts of God that might have caused the fire. After examining the building, reviewing the surveillance video, and conducting interviews, [the expert] concluded that the fire was incendiary.

Id. at 401. "[T]he trial court . . . found that the expert's process of elimination was commonly used in the field and was not disallowed by the applicable guidelines." Id. After being convicted, the defendant appealed and claimed that the district court erred by admitting testimony from the government's expert witness. Id. at 400. The court of appeals ultimately held that the district court did not abuse its discretion by permitting the expert's testimony. Id. at 401.

In light of Santiago, this Court finds no reason to strike Plaintiffs' expert. The methodology utilized in Santiago is virtually identical to the methodology employed by Mr. Tijerina in this case. Mr. Tijerina systematically combed through the debris and conducted a number of interviews. After analyzing burn patterns, identifying areas of charring and other evidence of severe burning, and reviewing the video evidence of the fire, Mr. Tijerina was able to determine the fire's approximate origin. Then, focusing only on the area of origin, Mr. Tijerina, through process of elimination[4] and the consideration of information gathered throughout his investigation, concluded, in a comprehensive report, that the most likely cause of the fire was the spontaneous combustion of oil-stained rags. Even leaving Santiago aside, Mr. Tijerina's testimony survives a Daubert reliability inquiry. For instance, Mr. Tijerina's theory could easily be tested, spontaneous

---

[4] This Court agrees with the trial court in Santiago that process of elimination and deductive reasoning are commonly used in the field of fire investigation. For example, the User's Manual for NFPA 921: Guide for Fire and Explosion Investigations specifically addresses the use of deductive reasoning in fire investigations: "[After developing a hypothesis], the [fire] investigator uses *deductive reasoning* to test the hypothesis that was developed. Through deductive reasoning, the ultimate conclusion is supported, unsupported, or refuted by the complete body of evidence and data. . . . Ultimately, the investigator's goal is to find only one hypothesis that is supported to a probability (more likely than not)." National Fire Protection Agency, User's Manual for NFPA 921: Guide for Fire and Explosion Investigations 16-17 (2005).

combustion is well-documented,[5] and the facts and methods Mr. Tijerina relied upon to reach his opinion are of the kind reasonably relied upon by experts in the field of fire investigation.[6]

Defendant Ruiz argues, however, that because Mr. Tijerina is not an expert in regard to spontaneous combustion—*i.e.* he does not know the temperature required for spontaneous combustion to occur, the amount of oil saturation necessary to result in combustion, *etc.*—he should not be allowed to testify as to his opinion regarding the most likely cause of the fire. (Doc. no. 38 at 8-10.) Defendant Ruiz argues that, at the very least, Mr. Tijerina should have performed a "test" of his hypothesis. (Id. at 8.)

Mr. Tijerina is not required to show the Court that he has reproduced, in a lab, exactly what he believed happened the day of the fire in order for his testimony to be admissible. Deductive reasoning and cognitive testing are common methods of determining the cause and origin of

---

[5] Mr. Tijerina notes in his testimony that the User's Manual for NFPA 921: Guide for Fire and Explosion Investigations, the Fire Protection Handbook, and Kirk's Fire Investigations, all address spontaneous combustion. (Tijerina Dep. at 16-17.) Moreover, the material data sheet for Zar, a product Defendant Ruiz admits the painters were using the day of the fire (Ruiz Dep. at 30), specifically states, "To avoid spontaneous combustion during temporary storage, soak soiled rags and waste immediately after use, in a water filled, closed metal container." (Doc. no. 46, Ex. 5 at 2).

[6] See supra nn.3-4.

23

fires. The National Fire Protection Association's <u>Guide for Fire and Explosion Investigations</u> specifically states:

> [I]t is important to understand that *testing the hypothesis* does not refer to only experimental testing, such as in a laboratory. Testing the hypothesis can be either cognitive or experimental. For example, during the testing and analysis of a hypothesis, the investigator will cognitively test the hypothesis on the basis of his or her knowledge and experience. Cognitive testing is the use of a person's thinking skills and judgment to evaluate the empirical data and challenge the conclusions of the final hypothesis.

National Fire Protection Agency, <u>User's Manual for NFPA 921: Guide for Fire and Explosion Investigations</u> 17 (2005).

Mr. Tijerina also should not be excluded from testifying based solely upon his inability, at the time of the deposition, to describe the exact conditions necessary for the spontaneous combustion of oil-stained rags, to state the number of rags necessary for spontaneous combustion to occur, or due to his inability to describe the conditions of the home the night of the fire. (<u>See</u> Doc. no. 38 at 8.) Mr. Tijerina's expert opinion is not based upon his extensive knowledge regarding spontaneous combustion, but rather is based upon his ability to determine the origin of the fire and his ability to rule out all causes of the fire except for the spontaneous combustion of oil-stained rags. This determination, through process of elimination, is not only accepted and

utilized by the community of fire investigators, but also has been accepted by several courts. See Santiago, 202 Fed. Appx. at 401 (finding district court did not abuse its discretion after it "found that [the expert's] process of elimination was commonly used in the field and was not disallowed by the applicable guidelines"); see also Allstate, 137 F. Supp. 2d at 1289-90 (permitting expert's testimony based upon "process of eliminating alternative explanations").

While Mr. Tijerana's lack of knowledge regarding the necessary conditions for spontaneous combustion arguably draws into question his credibility, this can be dealt with on cross-examination and does not support excluding his testimony in its entirety. Similarly, the fact that another expert disagrees with Mr. Tijerana's conclusions (see doc. no. 38 at 10) is not a sufficient basis for exclusion. Once again, "the weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility." Jones, 861 F.2d at 663.

For the reasons stated above, the Court finds that Mr. Tijerana is qualified to testify competently regarding the matters he intends to address, the methodology by which he reaches his conclusions is sufficiently reliable, and Mr. Tijerana's testimony will assist the trier of fact in

determining the cause and origin of the fire. Accordingly, Defendant Ruiz's Motion to Strike Plaintiffs' Expert Witness (doc. no. 38) in its entirety is **DENIED**.

### c. Scope of Mr. Tijerina's Testimony

There are some issues addressed in Mr. Tijerina's report and deposition that appear unrelated to his defined area of expertise. Plaintiffs maintain that Mr. Tijerina was retained to determine the "cause and origin of the fire." (Doc. no. 46 at 3). Yet Mr. Tijerina's report addresses several topics unrelated to this purported area of expertise. (<u>See</u> Doc. no. 38, Ex. 1). For example, Mr. Tijerina's report draws conclusions regarding alleged security failures at the Ford Plantation. (<u>Id.</u> at 14.) Mr. Tijerina states, for example, "[T]he camera [showing the Gordon house] should have been monitored by the guards on duty the night of the fire." (<u>Id.</u>) Mr. Tijerina also speculates as to when the fire should have been identified by security (Tijerina Dep. at 67-68), and concludes that, had the fire department been notified promptly, damage to the residence could have been reduced. (<u>Id.</u> at 75.)

Plaintiffs have failed to explain how Mr. Tijerina's expertise as a cause and origin specialist qualifies him to make judgments regarding security and fire damage prevention. Mr. Tijerina specifically states in his

deposition that he does not plan to testify as a security expert, and yet, at the same time, states that he wishes to present at trial his views regarding when security should have noted the presence of a fire in the Gordon home. (Id. at 66-69.) In addition, Mr. Tijerina's deposition testimony draws conclusions regarding the adequacy of the security's response time. (See id. at 67.) Not only is there insufficient evidence in the record demonstrating Mr. Tijerina is qualified to make any determinations regarding what constitutes an adequate security response time, but this Court finds Mr. Tijerina's opinion, in this regard, does not assist the trier of fact, through the application of scientific, technical, or specialized expertise. A trier of fact, just as easily as Mr. Tijerina, could watch the surveillance video and make his or her own determination regarding when a lay security guard should have noticed the first sign of a fire on the security monitor.

Moreover, there is insufficient evidence in the record establishing that Mr. Tijerina is qualified to testify regarding fire damage prevention. Mr. Tijerina only spent three years as a firefighter (doc. no. 38, ex. 1 at 40), and yet it appears he wishes to testify at trial as to the exact moment at which the fire department could have

arrived and prevented substantial damage to the home. (See Tijerina Dep. at 82.) This potential testimony is only tangentially related to Mr. Tijerina's expertise as a cause and origin investigator and, without more, shall not be admitted at trial.

Even if Plaintiffs could show that this is an area in which Mr. Tijerina is qualified to testify, this Court maintains serious doubts about the factual basis for such testimony. There are an infinite number of factors that could have affected the fire department's ability to combat the fire, and yet Mr. Tijerina appears to rely almost exclusively on a videotape that shows only a small portion of the Gordon home. (Id. at 75.) Mr. Tijerina, referencing the videotape, states in a conclusory fashion that if the fire department "had been notified promptly, they would have been able to arrive at the scene, make an interior attack on the residence, knock the fire down into the living-room area, and possibly the study area, causing only that area to be replaced." (Id. at 73-74.) Plaintiffs' expert provides almost no basis for the above conclusion and, by all appearances, is merely speculating.

"[W]here an expert's testimony amounts to no more than a mere guess or speculation, a court should exclude [the] testimony." United States v. 0.161 Acres of Land, 837 F.2d

1036, 1040 (11th Cir. 1988). Mr. Tijerina's testimony and report on this issue is outside his purported expertise, speculative, and ambiguous. Therefore, his testimony with regard to the issue of fire damage prevention and mitigation shall not be permitted at trial.

Pursuant to this Court's Order, Plaintiffs' expert, Antony Tijerina, is hereby permitted to testify only to the cause and origin of the fire.

### 2. Defendant Martin Ruiz's Motion for Summary Judgment

Defendant Martin Ruiz filed a Motion for Summary Judgment contemporaneously with his Motion to Strike Plaintiffs' Expert Witness. (Doc. no. 39.) Defendant Ruiz's motion is based entirely upon the anticipated success of his Motion to Strike. Defendant Ruiz argues, for example, "In the absence of Tijerina's opinions, there is no evidence in the record to show that the fire was caused by spontaneous combustion of stain soaked rags." (Doc. no. 39, Ex. 2 at 3.) Having found that Plaintiffs' expert, Antony Tijerina, shall be permitted to testify as to the cause and origin of the fire, the arguments presented in Defendant Ruiz's brief fail and, therefore, Defendant Ruiz's Motion for Summary Judgment (doc. no. 39) is **DENIED**.

### B. The Association's Motion for Summary Judgment and Plaintiffs' Related Motion to Amend the Scheduling Order and Substitute Party

#### 1. *Plaintiffs' Motion to Amend the Scheduling Order and Substitute Party*

On November 4, 2008, United States Magistrate Judge G.R. Smith issued a scheduling order requiring that all motions to amend or add parties in this case be submitted by December 22, 2008. (Doc. no. 14.) On March 27, 2009, Plaintiffs filed a stipulation, signed by all parties, requesting the substitution of Defendant Ford LLC. (Doc. no. 33 at 1.) The stipulation asks the Court to permit the substitution of the Association in place of Ford LLC as party defendant. (Id.) While Defendant Ford LLC initially consented to the stipulation by signing it, now, on summary judgment, Defendant Ford LLC argues:

> The Association, rather than the Developer, is the proper Ford Plantation defendant in this case; Plaintiffs have failed to take the necessary steps to make the Association a party to this action within the timeframe specified in the Court's Scheduling Order, and Plaintiffs should now be barred from doing so in light of their lack of diligence in seeking the Court's hand in effecting such change.

(Doc. no. 42 at 11.)

According to Ford LLC, Plaintiffs have had notice that they sued the wrong entity since October 23, 2008, when Ford LLC filed its initial Answer denying that it provided security services. (Id. at 12.) Ford LLC also argues

30

Plaintiffs' mistake was further clarified in Ford LLC's initial disclosures, which included the Ford Plantation's Declaration of Covenants, Conditions, and Restrictions. (Id.) Upon this basis, Defendant Ford argues summary judgment should be granted in its favor because Plaintiffs have named the wrong Ford Plantation defendant and are now barred from doing so. (Id. at 10.)

Rule 16(b)(4) states, "A schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "The good cause standard precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'" Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1418 (11th Cir. 1998) (quoting Fed. R. Civ. P. 16 Advisory Committee's Note). Only after determining that good cause exists for amending the scheduling order, does the Court then decide whether amendment is proper under Rule 15(a). See id. at 1419. Rule 15(a) reads as follows: "[A] party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a).

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the

> amendment, futility of amendment, etc.—the leave
> sought should, as the rules require, be "freely
> given."

<u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962).

This Court finds that Plaintiffs have shown good cause for amending the scheduling order. Despite Ford LLC's contentions to the contrary, the evidence shows that Plaintiffs were unable to determine, within a reasonable degree of certainty, the proper Defendant until February 3, 2009, at which time Plaintiffs deposed Ford LLC's CFO, Thomas Yarborough. (Fultz Aff. ¶ 4.) During this deposition, Yarbrough confirmed that the Association was in charge of hiring and supervising the Plantation's security. (<u>Id.</u>) Within a little over a month, Plaintiffs prepared a document requesting leave for substitution of a party and made attempts to obtain Defendants' consent, which they obtained by March 26, 2009, one day before they filed their stipulation. (<u>Id.</u> ¶¶ 5-10.)

As stated above, Defendant Ford LLC argues that its Answer and Initial Disclosures provided Plaintiffs with sufficient information to conclude that Plaintiffs had brought suit against the wrong defendant. This argument fails to persuade this Court. Plaintiffs could have denied paragraph 10 of Plaintiffs' Complaint—"The Ford Plantation provides and maintains 24-hour security, including

surveillance, and in-person security for the residences of this private community"—for a variety of reasons. The denial of this paragraph, alone, cannot be said to have put Plaintiffs on notice that Ford LLC was the wrong party for the purposes of this lawsuit.

Defendant Ford LLC also argues that Plaintiffs were given notice that it was not the proper party for purposes of this lawsuit when it submitted, pursuant to Federal Rule of Civil Procedure 26, the Ford Plantation's Declaration of Covenants, Conditions, and Restrictions. Defendant Ford LLC directs the Court's attention to Section 4.7, "Security," which states the following: "The Association may, but shall not be obligated to, maintain or support certain activities within the Properties designed to make the Properties safer than they otherwise might be." (Doc. no. 42, Ex. 1 at 11.) Merely because the Declaration states that the Association "may" provide security services, does not mean that the Association, not Ford LLC, actually provided security. While, arguably, the Declaration should have raised some questions concerning whether Ford LLC was the proper party to the lawsuit, the fact that Plaintiffs were previously provided the Declaration is not enough to now bar an amendment to the scheduling order.

Furthermore, Plaintiffs acted diligently by taking note of the above-mentioned discrepancies and actively addressing them during discovery. Shortly after they were able to confirm suspicions raised by Ford LLC's responses and initial disclosures, Plaintiffs filed a prompt request for the substitution of the Association in place of Ford LLC. (Doc. no. 33.) Finally, to the extent Defendant Ford LLC argues that Plaintiffs failed to "*move* this Court to modify the Scheduling Order once they finally decided to name the Association as a defendant in this case" (doc. no. 70 at 2) (emphasis added), this Court simply is not willing to elevate form over substance here. Plaintiffs' "Stipulation" plainly requests the Court's permission to substitute a party; implicit in this request is a request to amend the scheduling order.

Pursuant to Rule 15(a), the Court not only finds that all parties provided written consent for the substitution, but there is no evidence of undue delay, bad faith, dilatory motive, evidence of repeated failures to cure deficiencies by amendments previously allowed, or potential undue prejudice to the opposing party. Permitting the substitution of the Association in place of Ford LLC is not only in the best interests of justice, but the lack of prejudice is implicitly demonstrated by Defendants' consent

to the substitution. Plaintiffs contend, and Defendants do not dispute, that not only has the Association been participating throughout this litigation, but, also, Ford LLC and the Association are both operated by the same board of directors, represented by the same counsel, and both entities would be subjected to the same claims and would advance the same defenses. (Doc. no. 57 at 8.)

For the foregoing reasons, Plaintiffs' Motion to Amend the Scheduling Order and to Substitute a Party, originally titled "Stipulation for Substitution of Party" (doc. no. 33), is hereby **GRANTED**.

### 2. The Association's Motion for Summary Judgment

Plaintiffs originally brought a claim against the Association for negligence and then, later, amended their complaint in order to include a claim for gross negligence. Plaintiffs have since conceded that the Ford Plantation's Declaration "runs with the land, that its binding on the Gordons and that it absolves Defendant Ford of simple negligence." (Doc. no. 57 at 9.) Plaintiffs, however, still allege that the Association committed gross negligence by failing to properly secure the premises, monitor the video surveillance, and notify emergency personnel in a timely manner. (Compl. ¶ 42.) According to Plaintiffs, when the Association hired security officers,

35

it assumed the duty of providing adequate security. (Doc. no. 57 at 9.) Plaintiffs allege that the Association breached that duty and its breach rose to the level of gross negligence. (Id.) The Association counters by arguing that, under Georgia law, its actions neither increased the risk of harm to the Gordons nor caused any harm as a result of the Gordons' reliance. (Doc. 70 at 5.) The Court agrees with the Association.

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Adler's Package Shop, Inc. v. Parker, 190 Ga. App. 68, 71 (1989) (quoting Restatement (Second) of Torts § 324A). "Under Georgia law a voluntary undertaking only creates liability when one of the[se] three additional requirements is present." U.S. Aviation Underwriters, Inc. v. United States, 530 F. Supp. 2d 1315, 1319 (M.D. Ga. 2007).

The Georgia Court of Appeals has stated that a party increases the risk of harm "when a nonhazardous condition is made hazardous through the negligence of a person who

changed its condition or caused it to be changed."
Adler's, 190 Ga. App. at 71 (quoting Argonaut Ins. Co. v.
Clark, 154 Ga. App. 183, 185 (1980)); see also U.S.
Aviation, 530 F. Supp. 2d at 1315 (noting that plaintiffs
were required to show that United States' provision of
aviation weather forecasts increased risk of weather
conditions in order to establish that defendant's actions
increased risk of harm under voluntary undertaking
analysis).

In Dale v. Keith Built Homes, Inc., 275 Ga. App. 218,
219 (2005), for example, a contractor was sued after one of
its subcontractors struck a child with his car after
drinking several beers at work.  The child's parents sued
under a voluntary undertaking theory; they argued that the
contractor's failure to properly enforce its no-drinking
policy at the worksite increased the risk of harm to the
child.  Id. at 219-20.  The Georgia Court of Appeals
ultimately affirmed the trial court's decision to grant
summary judgment against the plaintiffs.  The court stated
the following regarding the plaintiffs' voluntary
undertaking argument:

> The plaintiffs essentially argue that it was
> incumbent upon [the defendant] to *decrease* the
> risk of harm to others by enforcing its no-
> drinking policy.  This, however, is not the law;
> "*failing to take all possible actions to prevent*

> *an occurrence is not the same as increasing the*
> *risk of the occurrence*."

Id. at 220 (quoting Griffin v. AAA Auto S. Sec., 221 Ga.
App. 1, 3 (1996)) (emphasis added).

In this case, Plaintiffs make an argument similar to
the one rejected in Dale. Plaintiffs argue that the
Association's failure to properly monitor the security
screens and establish a specific protocol for monitoring
the screens increased "the risk of harm to the resident."
(Doc. no. 57 at 15.) Plaintiffs continue, "An example of
such an elevation of harm is the destruction of the
Gordon's residence. The Defendant did not cause the fire,
but its gross misfeasance caused it to spread and totally
destroy the home." (Id.) Plaintiffs fail, however, to
explain how the security's alleged failings *increased* the
risk that the fire would occur or spread beyond control.
Like in Dale, Plaintiffs appear to argue that it was
"incumbent upon [the Association] to *decrease* the risk of
harm to others," Dale, 275 Ga. App. at 220, by enforcing a
strict policy regarding the monitoring of its security
screens. As the Georgia Court of Appeals has already
pointed out, this is not the law—"failing to take all
possible actions to prevent an occurrence is not the same
as increasing the risk of the occurrence." Id. The
Association's actions simply did not make a "nonhazardous

condition" become "hazardous."  <u>Adler's</u>, 190 Ga. App. at 71.

Moreover, Plaintiffs have provided no evidence that the Gordons detrimentally relied on the monitoring of the Association's surveillance cameras. Not only does the Ford Plantation's Declaration of Covenants, Conditions, and Restrictions implicitly state that residents should not rely upon any security provided by the Association, but, more importantly, the Gordons were unaware, until after the fire, that a camera had been recording their home. (J. Gordon Dep. at 28; N. Gordon Dep. at 28.) The only security at the Ford Plantation the Gordons were aware of, at least in regard to the monitoring of their home, was the security's regular patrol of the neighborhood. (J. Gordon Dep. at 30.) Nevertheless, prior to the fire, the Gordons never requested that security personnel pay special attention to their home while it was being built. (J. Gordon Dep. at 29; N. Gordon Dep. at 28.)

Once again, Plaintiffs address this issue in a conclusory fashion: "When the Gordons became residents of the Plantation, they knew that security was provided and that they would protect them and their property." (Doc. no. 57 at 15.) In support of this contention, Plaintiffs cite Mr. Gordon's deposition: "We assumed that [monitoring

of the house while under construction] was being taken care of as a part of the – part of the ongoing things that the Ford Plantation was doing or should have done or had done." (J. Gordon Dep. at 29-30.) Mr. Gordon's testimony simply is not enough to show detrimental reliance. All his testimony shows, if anything, is that he had an expectation that the Association would monitor his home during routine patrols. That was exactly what occurred the night of the fire—one of the Association's security guards recognized the fire on a routine patrol and promptly notified the fire department. Ultimately, the Court finds that Plaintiffs have failed to provide sufficient evidence showing that the Association could be held liable under a voluntary undertaking theory.

In addition, the Court finds that even if Plaintiffs could show evidence creating potential liability for a voluntary undertaking, Plaintiffs have too broadly defined the scope of the undertaking. The Association never intended nor made any representations indicating that it intended to utilize video surveillance for the purpose of residential fire prevention. The surveillance cameras were utilized, according to all testimony in the record, to observe access points throughout the property and to prevent illegal activity. (Gaskin Dep. at 24.) Despite

Plaintiffs' assertion that "[o]ne of the cameras was positioned to capture the docks and the rear portion of the Gordon's residence and land," (doc. no. 57 at 3), the Court has found no evidence in the record to substantiate the claim that the camera was positioned intentionally to capture the Gordons' home. By all indications, the recording of the Gordons' home was merely incidental to the recording of the marina, a critical access point to the Ford Plantation. This is supported by the fact that there is no evidence in the record demonstrating that any other home within the Ford Plantation was monitored by a surveillance camera at the time of the fire. Even assuming the Association assumed a duty to provide general security, it is plain that the Association never assumed a duty to regularly monitor surveillance monitors for the purpose of residential fire prevention.

Further, no reasonable juror could find that gross negligence occurred here.

> In general, slight diligence is that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances. As applied to the preservation of property, the term "slight diligence" means that care which every man of common sense, however inattentive he may be, takes of his own property. The absence of such care is termed gross negligence.

O.C.G.A. § 51-1-4.

While "questions of gross, ordinary, and slight negligence . . . are as a rule to be determined by the jury," Wood v. Morris, 109 Ga. App. 148, 151 (1964), in "plain and indisputable cases" a court may make a decision as a matter of law. Moore v. Shirley, 68 Ga. App. 38, 38 (1924); see also Barbazza v. Int'l Motor Sports Ass'n, Inc., 245 Ga. App. 790, 792 (2000) (finding summary judgment proper after appellants identified no evidence of gross negligence).

In Flood v. Young Woman's Christian Assoc. of Brunswick, Ga., Inc., 398 F.3d 1261, 1267 (11th Cir. 2005), a plaintiff argued that YWCA lifeguards committed gross negligence by failing to properly monitor a swimmer who ultimately drowned. Id. at 1266. Plaintiff presented evidence showing that Red Cross lifeguarding standards require lifeguards to observe each swimmer every ten seconds. Id. Plaintiff contended that the lifeguards committed gross negligence by leaving their observation posts and failing to survey the pool patrons for at least three minutes. Id. The Eleventh Circuit, applying Georgia law, held that the district court's grant of summary judgment was proper because, while the lifeguards were perhaps inattentive, their actions did not rise to the level of gross negligence. Id. at 1267. The court noted

that the lifeguards were guarding a pool with only a few swimmers and the deceased had been spending considerable amounts of time underwater. Id. The court also took into account, in upholding the grant of summary judgment, the fact that, "upon realizing that [the swimmer] was in distress, the lifeguards took immediate action and began rescue efforts." Id.

Similarly, here, while the security guard and the Association may have been "inattentive" in the overseeing and monitoring of the surveillance cameras, their actions do not rise to the level of gross negligence. The primary purpose of monitoring the cameras was to maintain the security of access points and to prevent crime, not to prevent residential fires. (Prevas Dep. at 78.) Therefore, a fire within the interior of a home only incidentally within the view of a surveillance camera would not likely be recognized very quickly. Furthermore, the Association's security was the first on the scene and promptly reported the fire as soon as it was discovered. The discovery of the fire was the direct result of the effectiveness of the Association's security policies, which included routine patrols working in conjunction with a guard monitoring surveillance cameras.

In this case, where, among other things, there was no duty to provide security in the first place, the Gordons were bound to assume all risks of personal injury, loss or damage to property, and the Association's security was the first to discover and report the fire, the Court fails to see how gross negligence can be reasonably inferred. See Hayes v. Lakeside Village Owners Assoc., Inc., 282 Ga. App. 866, 870 (2006) ("[W]here there was no duty to inspect on the part of the Association, and the [plaintiffs] were bound to use the common area at their own risk, we fail to see how a higher degree of negligence on the part of the Association can reasonably be inferred.").

Based upon the foregoing, the Association's Motion for Summary Judgment (doc. no. 42) is hereby **GRANTED**.

## IV. CONCLUSION

For the reasons set forth above, Defendant Martin Ruiz's Motion to Strike Plaintiffs' Expert Witness (doc. no. 38) and his related Motion for Summary Judgment (doc. no. 39) are **DENIED**.

Plaintiffs' Motion to Amend the Scheduling Order and Substitute the Ford Plantation Association in place of the Ford Plantation, LLC, as party Defendant (doc. no. 33), is **GRANTED**.   The Ford Plantation Association's Motion for

Summary Judgment (doc. no. 42) is also **GRANTED**. The Clerk is **DIRECTED** to enter **JUDGMENT** in favor of Defendant Ford Plantation Association. This case **SHALL PROCEED TO TRIAL** against Defendant Martin Ruiz d/b/a Hilton Head Painting.

**ORDER ENTERED** at Augusta, Georgia this 5th day of February, 2010.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA